| | |
|---|---|
| **RONALD KREGER, SR.** | **CIVIL ACTION** |
| **VERSUS** | **NO:   07-575** |
| **GENERAL STEEL CORPORATION, GREGG LANIER HOWELL, WORLDWIDE CONCRETE AND STEEL ERECTIONS, L.L.C.** | **SECTION: "C" (1)** |

## ORDER AND REASONS

Before the Court is a Motion to Certify Class by plaintiff Ronald Kreger ("Kreger") (Rec. Doc. 546).  The Motion is before the Court on the briefs without oral argument.  Having reviewed the record, memoranda of counsel, and the law, the Court DENIES the Motion for the following reasons.[1]

## I.  BACKGROUND

On February 1, 2007, Plaintiff Ronald Kreger filed a complaint against three defendants: General Steel, Gregg Lanier Howell ("Howell") and Worldwide Concrete and Steel Erections, LLC ("Worldwide").  Kreger sought damages for fraud, unfair and deceptive trade practices, conspiracy, negligent misrepresentation, fraud in the inducement, breach of contract and detrimental reliance. (Rec. Doc. 1).  He has since reduced his claims to two: breach of contract and misrepresentation of services in violation of the Colorado Consumer Protection Act ("CCPA").

Kreger's claims stem from a contract signed with General Steel for a steel building to

---

[1]  General Steel recently filed an opposed Motion for Leave to File (Rec. Doc. 691).  In the interests of proceeding with as complete a record as possible, that motion is GRANTED.

replace the building housing his former business, which was destroyed in Hurricane Katrina. (Rec. Doc. 546-7 at 3; 473 at 15). He alleges that General Steel misrepresented the services it would provide, breached an implied contract to provide oversight of the construction process, and negligently referred him to a contractor – Howell – who was a convicted felon and under investigation by the F.B.I.

As to General Steel's alleged misrepresentations of its own services, Kreger asserts that General Steel promised him that it would provide a "turnkey" building project, meaning that General Steel would complete it in its entirety and hand Kreger the keys. (Rec. Doc. 473 at 4). In fact, all General Steel provided was the building materials, and it was up to Kreger to independently contract with an erector to complete the job. Kreger also alleges that General Steel promised and failed to provide workable building plans or a foundation plan sufficient to obtain the requisite building permits. (Rec. Doc. 473 at 19).

Kreger further alleges that General Steel represented that it would provide project management to supervise all aspects of the building project. (Rec. Doc. 473 at 4). General Steel did assign Kreger a "project manager," Kent Perenyi. But instead of supervising the project as allegedly promised, Perenyi simply took Kreger's order and then recommended Howell as their "number one builder." Howell was a convicted felon, and despite a number of previous complaints about his work and responsiveness, General Steel continued to recommend him to customers.

Kreger signed a contract with Howell/Worldwide for $315,687.00 to build the foundation and to unpack and erect the building. (Rec. Doc. 473 at 18). Ultimately, Howell took Kreger's money, but never erected the building. Kreger alleges that General Steel knew or should have

known, prior to its referral, that Howell's work was sub-satisfactory, and therefore asserts that his loss was due in part to General Steel's negligent investigation and referral of Howell. (Rec. Doc. 473 at 5). Howell has since been incarcerated.

Kreger now seeks to certify a class, arguing that General Steel misrepresented to each member of the class that it would oversee all phases of their construction projects. (Rec. Doc. 546-2 at 2). He also asserts that but for General Steel's recommendations, no members of the class would have contracted with Howell. (Rec. Doc. 546-2 at 2). Kreger defines the putative class as those who:

1. Bought buildings from General Steel from Jan. 1 2005 through Jul. 31, 2007;

2. Were referred by General Steel to Howell/Worldwide; and

3. Contracted with Howell/Worldwide.

(Rec. Doc. 546-2 at 1).

As of the motion to certify class, Kreger has identified thirty seven putative members, though General Steel disputes the accuracy of this number. (Rec. Doc. 546-4 at 1-2).

Shortly before the hearing date for the motion to certify, the parties informed the Court that they had agreed to proceed with the motion on the briefs. As such, Kreger's motion to amend witness and exhibit list[2] and his motion to expedite are MOOT. (Rec. Docs. 584, 595).

## II. LAW AND ANALYSIS

*Motions to Strike Exhibits*

Kreger filed a motion to strike objecting to four of General Steel's exhibits. (Rec. Doc. 594). General Steel filed objections to eighteen specified exhibits filed by Kreger. (Rec. Doc.

---

[2] Specific objections to the exhibits are addressed immediately below.

601).  Many of General Steel's same objections are raised in connection with some of Kreger's deposition designations, and will be addressed concurrently.  (Rec. Doc. 602).

A.  Kreger's Motion

Kreger objects to General Steel exhibits 86-89, which are summary charts of the relationships between the putative class, General Steel, and Howell/WWC.  (Rec. Doc. 594-3).  As to Exhibit 86 he argues that the summary charts are not appropriately supported by the evidence, and are instead based on hearsay.  (Rec. Doc. 594-3 at 3).  As to 87-89, he argues that the charts are inaccurate, misleading, or fail to include appropriate putative class members.  (Rec. Doc. 594-3 at 6-9).

As this motion is being heard on the briefs, the Court will heed Kreger's warnings that the charts have not been verified, and will take them for what they are worth.  To the extent they nonetheless provide useful approximations, his objections are OVERRULED.

B.  General Steel's Objections

General Steel objects to Kreger Exhibits 8, 81-83, 85-90, 129-135, and 138.

General Steel's objection to Exhibit 8 is that it is not properly authenticated.  (Rec. Doc. 601 at 1).  Kreger argues that the document, a list of General Steel customers referred to WWC, was prepared by WWC employee Rodney Bont.  As with Kreger's objections above, the Court will accept the exhibit with caution.  The objection is OVERRULED.

The objection to Exhibit 137 is that it indicates that it was "supplied by General Steel." (Rec. Doc. 601 at 3).  The Court notes the objection, and will not presume the list to be a tacit acknowledgment that certification of those class members is appropriate.

The remaining objections all relate to the inclusion of documents relating to an action

4

instituted against General Steel by the Colorado Attorney General. The Court previously upheld

the magistrate's ruling that Kreger could not amend his complaint to add claims "tracking" the

Attorney General's litigation. (Rec. Doc. 412 at 3). However, as the Court held in its ruling on

General Steel's Motion to Strike (Rec. Doc. 550), this does not mean that all references or

evidence that overlaps with the Attorney General litigation must be stricken or is irrelevant.

There is undoubtedly significant intersection of relevant documents in the two actions. Because

the Court finds, *infra*, that parts of the putative class's CCPA claims could be proven class wide

as a course of conduct, that evidence is relevant. General Steel's objections are OVERRULED.


*Motion to Certify Class*

To certify the class, Kreger must meet the four requirements of Federal Rule of Civil

Procedure 23(a). That Rule reads:

> Prerequisites. One or more members of a class may sue or be sued as representative
> parties on behalf of all members only if:
>> (1) the class is so numerous that joinder of all members is impracticable;
>> (2) there are questions of law or fact common to the class;
>> (3) the claims or defenses of the representative parties are typical of the claims or
>> defenses of the class; and
>> (4) the representative parties will fairly and adequately protect the interests of the
>> class.

Kreger must also meet at least one requirement of Rule 23(b):

> Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>> (1) prosecuting separate actions by or against individual class members would
>> create a risk of:
>>> (A) inconsistent or varying adjudications with respect to individual class
>>> members that would establish incompatible standards of conduct for the
>>> party opposing the class; or
>>> (B) adjudications with respect to individual class members that, as a
>>> practical matter, would be dispositive of the interests of the other members
>>> not parties to the individual adjudications or would substantially impair or

impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Kreger seeks certification under Rule 23(b)(3) (predominance and superiority). General Steel asserts that the putative class fails to meet the requirements of both Rule Rule 23(a) and Rule 23(b). Their respective arguments will be addressed in turn.

Rule 23(a): Prerequisites

*Rule 23(a)(1): Numerosity*

Rule 23(a)(1) requires that parties are so numerous that joinder is impractical. There is no magic number when this cut off is reached. Instead, a district court is obliged to review the totality of the circumstances in assessing how many class members is "enough." Some courts have nonetheless suggest approximate "ranges" in which the size of a putative class is likely sufficient.

In *Phillips v. Joint Legislative Committee on Performance and Expenditure of the State of Mississippi*, 637 F.2d 1014, 1022 (5th Cir. 1981), the Fifth Circuit noted, in assessing whether a putative class of thirty three was sufficient, that "[t]he problem before the district court, and now before us, is not simply to say whether 33 class members are enough or too few to satisfy

Rule 23(a)(1). Ample case law can be cited to show that smaller classes have been certified and larger ones denied certification for lack of numerosity." *Id.* Continuing, the court emphasized that "[t]he proper focus is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *Id.*

The "practicability" prong also encompasses the geographic dispersion of the potential class members, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981); 7A C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 1762, at 211 (2005). The rules governing impracticability can be distilled as follows:

(1) impracticability short of impossibility is sufficient;

(2) evidence of exact class size is not required;

(3) when the class is large, numbers alone should be dispositive;

(4) when the class is small, factors other than number will be significant; and

(5) a common sense approach is contemplated by Rule 23.

1 W. Rubenstein, A. Conte, & H. Newberg, *Newberg on Class Actions* § 3.3 (2009).

Kreger has identified thirty seven putative class members (Rec. Doc. 546-4 at 1-2), and argues that thirty seven is a sufficient number to satisfy the requirements for numerosity in this case, particularly since the putative class members are dispersed among twenty five states,[3] and many are financially unable to pursue their claims individually. (Rec. Doc 546-2 at 7-8).

---

[3] The states at issues are: Alabama, California, Florida, Georgia, Illinois, Iowa, Kentucky, Louisiana, Maryland, Minnesota, Mississippi, Missouri, Montana, New Jersey, New York, New Mexico, North Carolina, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, West Virginia, Wyoming. At least one plaintiff is from the District of Columbia. (Rec. Doc. 546-2 at 8-9 n.10).

General Steel argues that a class of under forty people is insufficient. (Rec. Doc. 564 at 47). This argument is made in conjunction with their assertion that several of the putative class members identified by Kreger do not meet the class requirements, and by the fact that four other putative class members have released General Steel from liability.[4] Further, the class is "easily identifiable," which weighs against the impracticability of joinder. Lastly, General Steel argues that Kreger has presented insufficient evidence about the putative class members' ability to pursue their claims individually. Relatedly, they argue that the size of the individual claims must be considered in conjunction with any such alleged inability, as a contingency fee arrangement could potentially relieve the former difficulty if the claim is large enough. (Rec. Doc. 564 at 48).

Plaintiffs have the burden to show that joinder is impractical, and Kreger relies heavily on the geographic diversity factor. Before this question can be resolved, it is necessary to examine the putative class members to whom General Steel objects so that the Court can estimate the size of the putative class.

*Terry Maupin*

General Steel argues that Terry Maupin ("Maupin") should be excluded from the putative class because he never entered into a contract with General Steel; his claims are solely based on a General Steel referral to Howell, without any contractual basis.

Kreger argues that General Steel "devised" the transaction between General Steel, Howell, and Maupin, and that Howell essentially served as an intermediary. Deposition

---

[4] In their briefing, General Steel indicated that they objected to "ten putative class members" (Rec. Doc. 564 at 19) but by the Court's count, they proceeded to list objections to only nine class members. Kreger has since withdrawn Heartland equipment from their list of putative class members, (Rec. Doc. 569-3 at 11) leaving the number in dispute at eight.

testimony by both General Steel employees and Maupin support Kreger's assertions.[5]

The current class definition requires that class members have "bought buildings from General Steel." (Rec. Doc. 546-2 at 1). General Steel is correct that Maupin did not do this. However, adherence to the letter of the class definition at the expense of the efficient resolution of common claims defeats one of the fundamental justifications for class litigation. Further, as the Court has previously mentioned, the Court has the "power and obligation to define [the] class." (Rec. Doc. 550 at 2) (citing 2 AM. JUR. 2D *Federal Courts* §§ 1600-01 (1981)). Maupin is appropriately included in the putative class at this stage of the litigation.

*Mt. Sinai Covenant Church*

General Steel complains that Kreger cannot meet its burden of proving that Mt. Sinai Covenant Church contracted with WWC. Kreger responds that this evidence is only available by deposition, and that General Steel cannot prove that Mt. Sinai did not contract with WWC. (Rec. Doc. 569-3 at 8). Such depositions, it asserts, are unavailable due to discovery restrictions requested by General Steel.[6]

The plaintiff bears the burden of proving that each prerequisite to class certification has been met. *Zeidman*, 651 F.2d at 1038. However, the defendant cannot succeed simply by

---

[5] General Steel project manager Chris Hawthorne, Maupin's nephew, testified that "[h]ad it not been for our – my relationship with my uncle and everything else, there's no reason why World Wide would even be in this whole transaction to begin with. And from the beginning, my uncle was supposed to be buying a building from General Steel." (Rec. Doc. 569-9 at 10). When Maupin contacted General Steel after Howell wrote a bad check, he was assured by General Steel management that he had nothing to worry about. On those assurances, he sent Howell an additional payment of $122,236. (Rec. Doc. 546-4 at 51-54).

[6] Magistrate Judge Shushan limited the parties' deposition to a combined total of twenty. (Rec. Doc. 71 at 2-3).

limiting the scope of plaintiff's discovery. Further, while Mt. Sinai's inclusion in the class speaks to the numerosity element, it is not of itself part of Kreger's burden to prove the prerequisites of certification. To the extent additional proof is needed to determine an individual class member's eligibility, that information can be elicited post-certification, if appropriate. For the purposes of estimating the size of the putative class, the Court will include Mt. Sinai.

*Zion Hill*

Similarly, plaintiffs can present no proof that Zion Hill First African Baptist Church ("Zion Hill") contracted with WWC. Again, plaintiffs blame discovery limitations for their lack of evidence. (Rec. Doc. 569-3 at 9). But here General Steel cites the deposition testimony of Howell, who said, "I know there was never a contract [between WWC and Zion Hill]." (Rec. Doc. 564-2 at 26). Former General Steel counsel Robert Shilliday also submitted an affidavit recounting a phone call to Zion Hill pastor Amos Jones in which Jones stated that "Zion Hill never contracted with or paid any money to WWC or Gregg Howell." (Rec. Doc. 564-4 at 16).

Kreger dismisses this evidence as self serving, citing the call logs from General Steel's ACT Notes as evidence of a year long relationship between Zion Hill and Howell. (Rec. Doc. 569-3 at 15). The ACT Notes demonstrate that although Howell provided Zion Hill with a quote for the project, (Rec. Doc.569-5 at 19) Zion Hill's progress was delayed by fundraising and zoning issues and they never gave Howell any money. (Rec. Doc. 569-5 at 17).

The Court agrees that Kreger has failed to demonstrate a likelihood that Zion Hill meets the class requirements. General Steel has made an effective showing that Zion Hill did not contract with WWC/Howell. For estimation purposes, the Court will not include Zion Hill.

*Overcoming Holy Church of God*

10

Similarly, there is also no evidence that Overcoming Holy Church of God ("Overcoming Church") contracted with Howell. No representative of the Church was deposed, and the ACT Notes show only that Overcoming Church and Howell had some form of working relationship.

Kreger cites to Exhibit E of their reply brief in support of their motion to certify class as evidence that the church "worked with Howell." (Rec. Doc. 569-3 at 10; Rec. Doc. 569-5 at 16). Unless Kreger failed to include the documents he intended, the Court is at a loss for how that page of ACT Notes supports this assertion. It is devoid of reference to Howell or WWC, and at most establishes that a "Reginald" had ongoing contact with General Steel. Presumably this is a reference to "Reginald Davis" (Rec. Doc. 564-2 at 29), with whom Howell recalled working for "close to two years" but denied entering a contract. *Id.* For estimation purposes, the Court will not include Overcoming Church.

*Ephesus Seventh Day Adventist Church*

General Steel attacks the appropriateness of Ephesus Seventh Day Adventist Church ("Ephesus") on two grounds: 1) lack of a contract between Ephesus and WWC and 2) a prior settlement between Ephesus and General Steel. The contract is discussed below, and the settlement in the following section.

In terms of the contract, again it appears that despite lengthy discussions, no money was exchanged between Ephesus and Howell. (Rec. Doc. 564-4 at 5) ("Not one cent"). Nonetheless, Kreger argues that Ephesus had a "deal" sufficient to meet the terms of the class. (Rec. Doc. 569-3 at 10). Again, Kreger's evidence falls short of that required to persuade the Court that Ephesus should be included in its class size estimation.

*Settlements*

General Steel argues that settlement agreements signed by two class members, Ephesus and BTC Properties, preclude their inclusion in the class. "[I]ndividual settlement by the class representative is generally permissible unless the representative has obtained a premium for such settlement and unless there is otherwise some prejudice to class members." W. Rubenstein et al, 4 *Newberg on Class Actions* § 11:75 (4th ed. 2009).

Kreger argues that the settlements are voidable because General Steel failed to disclose to the settling parties that the instant class action was pending. (Rec. Doc. 569-3 at 11). Kreger cites *In re General Motors Corp. Engine Interchange Litig*, 594 F.2d 1106, 1139 (7th Cir. 1979), for the proposition that a class defendant is obliged to notify an absent individual putative class member of pending class litigation. (Rec. Doc. 569-3 at 11). There, the Seventh Circuit invalidated a class wide settlement due to fundamental unfairness, and directed General Motors that future individual offers of settlement were subject to prior district court approval. *Id.* at 1138. The court then noted "[t]he danger that the offer to settle individual claims would create is the possible misleading of class members about the strength and extent of their claims and the alternatives for obtaining satisfaction of those claims." *Id.* at 1139.

The Court has inherent power to oversee the conduct of communications between parties or prospective parties, even before the class is certified. *See Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*, 238 F.Supp.2d 151, 154 (D.D.C. 2002). Following the lead of other courts in this district, the Court adopts the three part test laid out in *In re General Motors* for communications to putative class members: "[A]n offer to settle [made to individual class members] should contain sufficient information to enable a class member to determine (1) whether to accept the offer to settle, (2) the effects of settling, and (3) the available avenues for pursuing his claim if he

does not settle. . . . [J]udicial examination of the offer to settle individual claims largely entails only consideration of the accuracy and completeness of the disclosure." *Id.*; *cf. In re Shell Oil Refinery*, 152 F.R.D. 526, 536 (E.D.La. 1989) (directing application of this test to assess settlement offers made to individual class members).

In this case, there is insufficient evidence before the Court to determine the propriety of the settlement, but it appears that neither Ephesus nor BTC was apprised of the pending class litigation when the settlement offer was made, in violation of the principles of *In re General Motors.* 238 F.Supp.2d at 154. Therefore, the Court declines to honor these settlements for the purposes of estimating the class size.[7]

Next, General Steel cites the "executed erector referral agreements" signed by two other putative class members, Dennis Boivin and US Filter, that contain "broad releases in favor of General Steel." (Rec. Doc. 564 at 20). The agreements indicated that those parties "agree[d] to indemnify and hold harmless [General Steel] for all claims arising from the referral of a building erector or contractor." (Rec. Doc. 564-4 at 22-24).

The erector referral agreement indicated that the signing of the referral agreement was "in consideration for" General Steel's providing the name and contact information of an erector or general contractor. (Rec. Doc. 564-4 at 22). Kreger appears to rely on this language, arguing that both disputed parties signed their erector referral agreements *after* General Steel had already referred them to Howell. Kreger concludes that the agreements lacked consideration and were an "attempt to absolve [General Steel] of liability after the fact." (Rec. Doc. 605-3 at 5).

---

[7] Ephesus is nonetheless excluded on the grounds that there is no evidence that it contracted with WWC/Howell.

The parties' arguments raise myriad contract law questions including, *inter alia*, consideration, intent, and error. Resolving this dispute requires both a choice of law analysis and additional facts not currently before the Court regarding the timing and circumstances of the release. These issues have not been fully briefed and the relevant discovery is not before the Court. Again, the Court will not exclude these parties from the numerosity estimate on the basis of the contested release.

In sum, there are twenty seven undisputed putative class members. Additionally, there are the disputed Maupin, Zion Hill, Overcoming Church, and Mt. Sinai "contracts" and the contested settlements, which account for another four. Having now determined that Zion Hill, Overcoming Church, Mt. Sinai, and Ephesus should not be included in the class size estimate, there are thirty one members in the putative class. Their estimated claims range anywhere from approximately $32,000 to $1,180,000. (Joint Bench Book Tabs 208-209).

The Court is persuaded that joinder in this case is impracticable. Although the class members are identifiable, they are dispersed throughout the country, and many have claims that are small enough that protracted litigation might be unrealistic.[8] The plaintiffs have met the numerosity requirement of Rule 23(a).

*Rule 23(a)(2): Commonality*

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Kreger asserts three such questions:

---

[8] As discussed, *infra*, regarding choice of law, the Court makes no factual findings as to the ability of any party to pursue litigation. Rather it notes that class certification, rather than joinder, is a more reasonable litigation option for the putative class members with smaller value claims.

1. Whether General Steel misrepresented its services under the Colorado Consumer Protection Act

2. Whether General Steel breached its contract by not providing oversight of the projects

3. Whether General Steel highly recommended Howell without sufficient investigation of him (or with knowledge of his criminal background)

(Rec. Doc. 546-2 at 15).

General Steel does not contest commonality *per se*, though many of the same issues are raised under the arguably more stringent predominance standards of Rule 23(b), discussed below.  The Court likewise defers its discussion.

*Rule 23(a)(3): Typicality*

General Steel argues that Kreger's claims do not have the same essential characteristics as those of the putative class.  They distinguish Kreger's claims because 1) he received foundation plans, while other putative class members did not; 2) he received no building materials, while other putative class members did; and 3) he anticipated receiving a "turnkey" building from General Steel, while other class members were aware of the division between General Steel and WWC.  (Rec. Doc. 564 at 40).

Plaintiff disputes the assertion that these are valid differences, (Rec. Doc. 569-3 at 54-55) but again, both parties direct the majority of their arguments to comparable discussions under the more rigorous 23(b)(3) standards, discussed below, and the Court will follow suit.

*Rule 23(a)(4): Adequacy of Representation*

"Rule 23(a)'s adequacy requirement encompasses class representatives, their counsel, and the relationship between the two."  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479

(5th Cir. 2001) (citing 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1769.1, at 375 (2d ed. 1986)). "The adequacy requirement mandates an inquiry into [1] the zeal and competence of the representative[s'] counsel and . . . [2] the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees[.]" *Berger*, 257 F.3d at 479 (citing *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir.1982)).

Defendants do not contest the adequacy of class counsel, and Defendant's expert F.A. Little endorsed plaintiff's lead counsel's legal competence in deposition. (Rec. Doc. 546-6 at 31). In the absence of a challenge to adequacy, the Court can take judicial notice of class counsel's competence. *Falcon v. General Telephone Co.*, 626 F.2d 369, 376 n.8 (5th Cir. 1980), *vacated on other grounds*, 450 U.S. 1036 (1981).

The burden of proving the adequacy of the class representative is on the plaintiff, and adequacy cannot be presumed, even in the absence of objection. *Berger*, 257 F.3d at 481. In general, the named representative "must be of such a character as to assure the vigorous prosecution or defense of th action so that the members' rights are certain to be protected. 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1766, at 352 (3d ed. 2005). Further, "knowledge of the intricacies of the litigation is not required"; "general knowledge of what is involved in sufficient." *Id.* at 367. Here, Kreger testified in deposition that he was prepared to attend and participate in the action to the full extent required in pursuit of this action. (Rec. Doc. 546-4 at 34). He is self employed, and therefore not constrained in his ability to devote the necessary time to the litigation. *Id.* He is familiar with the claims being brought and is aware that his responsibilities include representing the interests

of any absent class members. *Id.*

The Court finds that Kreger and his counsel meet the requirements for rule 23(a)(4).


23(b)(3): Predominance and Superiority

The Court has determined that two of the four prerequisites to class certifications are met. The remaining two are in many ways subsumed by the predominance and superiority requirement of Rule 23(b)(3). Because the Court holds that common issues do not predominate, it does not need to address the commonality or typicality requirements as such.

To predominate, "common issues must constitute a significant part of the individual cases. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 62 (5th Cir. 1999). "This requirement, although reminiscent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (quoting *Amchem Prods.*, 521 U.S. at 623-24). In other words, "[t]he court is under a duty to evaluate the relationship between the common and individual issues." 7AA Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice & Procedure* § 1778, at 120 (3d ed. 2005).

Kreger has limited his causes of action to breach of contract/bad faith breach and violations of the CCPA. (Rec. Doc. 473 at 26-29). To meet the requirements of Rule 23(b)(3), a majority of the relevant proof of these claims must be common to the class. Kreger argues that "[a] common theme of indiscriminate referrals without warning customers of a felon who was continuing his criminal activity, and the implied promise the Project Managers would oversee the entire process but failed to do so, predominates this case." (Rec. Doc. 569-3 at 20).

In their contracts, the parties agreed to a valid choice of law provision. (Rec. Doc 546-6 at 4). General Steel does not contest the applicability of Colorado law to the class's contractual claims. However, the parties do dispute which law should apply to class members' consumer protection claims. General Steel argues, for reasons set forth below, that the law of each class member's home state governs each individual claim. Kreger argues that Colorado law governs all the class's claims. The Court will address the choice of law question first because given the centrality of the consumer protection claims to the case, if the Court must apply the law of each class member's home state to their consumer protection claims, Kreger's predominance and superiority claims must fail.

*Choice of Law–Consumer Protection Claims*

In *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir. 1996), a tobacco class action with a potential class numbering in the millions, the Fifth Circuit observed that "[a] requirement that a court know which law will apply before making a predominance determination is especially important when there may be differences in state law." *Id.* at 741. It then held that the district court had failed to "properly consider how variations in state law affect predominance." *Id.* This decision is particularly salient in light of the fact that, like the instant allegations, the plaintiffs' claims lay in consumer protection. In highlighting the shortcomings of the district court's response to defendants' "extensive analysis of how state law varied on fraud, products liability, affirmative defenses, negligent infliction of emotional distress, consumer protection statutes, and punitive damages," *id.*, the court noted that they "found it difficult to fathom how common issues could predominate in this case when variations in state law are thoroughly considered." *Id.* at n.15.

18

The posture of the present case differs somewhat from *Castano*: there, the court assumed that each state's law would apply, making predominance impossible. *Id.* at 742-43. Here, Kreger asserts, for two distinct reasons, that Colorado law alone should govern. First, he argues that General Steel has consented to the use of Colorado law in the contractual choice of law clause, and since waived any objection thereto. In the alternative, he argues that Colorado law would control under the Louisiana choice of law statutes, Civil Code Article 3515, *et seq*.

In determining the appropriate substantive law to apply, a district court must look to Louisiana choice of law rules because a federal court exercising diversity jurisdiction applies the choice of law rules of the forum state. *See Marchesani v. Pellerin-Milnor Corp.*, 269 F.3d 481, 485 (5th Cir.2001). Louisiana's general choice of law statute reads:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

LSA-C.C. Art. 3515. As explained in comment b to that article, the legislature adopted the "negative phrasing" above in an attempt to emphasize "interstate cooperation in conflict avoidance." The general principles of that article must be interpreted through the more specific guidance of the choice of law statutes pertaining to the particular issues of the case. If the issues are contractual, then Articles 3537 through 3541 concerning conventional obligations will apply. If the issues sound in tort, then Articles 3542 through 3548, concerning delictual and quasi-delictual obligations control.

As a preliminary matter, Kreger argues extensively that General Steel has waived any objection to the use of Colorado law. Kreger asserts that because General Steel did not raise its choice of law arguments until its Answer to Kreger's Revised Second Amended Complaint, they are waived. That Answer was filed on August 31, 2009, two and a half years after Kreger's original complaint, and two months after his motion to certify the class. Kreger argues that allowing General Steel to raise these objections now would be unduly prejudicial, and that it should be bound by its initial Answers and pleadings, which appeared to consent to the use of Colorado law in the resolution of this matter.[9]

However, the Court has an obligation to apply Louisiana choice of law rules, regardless of the whether the parties are or were in agreement. *Caton v. Leach Corp.*, 896 F.3d 939, 942 (5th Cir. 1990). Although other circuits might have concluded that choice of law questions can be stipulated or waived, ours has not. *Compare Caton*, 896 F.3d at 939 ("Although the parties agree that the choice of law clause contained in Caton's contract governs the choice of law analysis, our role as a federal court sitting in diversity requires application of the choice of law rules of the forum") *with Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 51 (2d Cir. 1984) ("in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied"). A choice of law analysis is appropriate.

The Court must therefore determine which provisions of the Louisiana Code control.[10]

---

[9] In its initial answer, General Steel's 54th defense noted "Louisiana law is inapplicable to Kreger's claims, and those of the purported class members - most of whom have no connection to the state of Louisiana. Rather, Kreger, General Steel, and the putative class members consented to the use of Colorado law." (Rec. Doc. 225 at 19).

[10] Throughout his briefing, Kreger relies heavily on a recent ruling in the District of New Jersey, *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), in which

Whether a consumer protection claim sounds in tort or contract (or delictual/conventional

obligations, in Louisiana) is not self evident. The court in *In re Bridgeston/Firestone, Inc.

Product Liability Litigation*, 155 F.Supp.2d 1069 (S.D. Ind. 2001) provided the following

analysis:

> Courts consistently examine the specific claims made in a particular case to determine whether a claim under a consumer protection statute should be treated as a tort or a contract action for choice of law purposes. *See, e.g., Hiller v. Manufacturers Product Research Group of North America, Inc*., 59 F.3d 1514, 1537 (5th Cir.1995) (plaintiffs' claim under Texas Deceptive Trade Practices Act sounded in tort)*; Crellin Technologies, Inc. v. Equipmentlease Corp*., 18 F.3d 1 (1st Cir.1994) (plaintiff's claim under Massachusetts's unfair trade practices law treated as tort claim for choice of law purposes because it resembled tort of fraudulent misrepresentation); *Lyon v. Caterpillar, Inc*., 194 F.R.D. 206, 213 (E.D. Pa.2000) (noting that claims under consumer fraud statutes may be based either in tort or contract law, and finding that "tort law is more appropriately applied considering the facts of this case" and therefore conducting a tort choice of law analysis to determine which state's statute should be applied); *Griffin v. Security Pacific Auto. Finan. Servs. Corp*., 25 F.Supp.2d 1214, 1216 (D.Kan.1998) (applying, without comment, Kansas tort choice of law analysis to determine which state's consumer protection statute applied); *Mead Corp. v. Stevens Cabinets, Inc*., 938 F.Supp. 87, 89 (D.Mass.1996) (finding that plaintiff's claim under Massachusetts consumer protection statute was "no more than a dressed-up breach of contract or breach of warranty claim" rather than a "separate, tort-based theory of fraud").

*In re Bridgestone/Firestone*, 155 F.Supp.2d at 1078 n.6. In this case, Kreger claims consumer

protection violations for misrepresentation of services and for failure to properly investigate

Howell. Although these claims undoubtedly initially arose out of the parties' contractual

relationship, both claims are, at their core, negligence based and sound in tort. *See Garnder v.

Zulu Social Aid and Pleasure Club, Inc.*, 729 So.2d 675, 678 n.3 (La.App. 1999) (defective float

---

a consumer class was certified despite differences in the laws of the many states involved. There are important differences between that case and this, particularly the choice of law rules at issue. That court applied the choice of law rules of six states and two methods of analysis and concluded that under both prominent choice of law regimes New Jersey law applied in that multi district consumer class action where New Jersey was headquarters of defendant. *Id.* at 55-69.

and negligent planning claims sound in tort despite arising out of contractual relationship).[11]

Although the claims in this matter sound in tort, they might nonetheless be encompassed by the contractual choice of law clause. In *Marinechance Shipping, LTD v. Sebastian*, 143 F.3d 216 (5th Cir. 1998), the Fifth Circuit, applying maritime law, held that a forum selection clause in the parties' contract was sufficiently broad to encompass tort causes of action. *Id.* at 222-23. That court's analysis emphasized that whether such a provision encompasses tort claims is governed by the wording of the clause itself. *Id.* The clauses approved of in *Marinechance* expressly included broad language such "all cases" "all disputes and matters whatsoever" or "any and all disputes or controversies." *Id.* By contrast, in *Benchmark Electronics, Inc. v. J.M. Huber Corporation*, 343 F.3d 719 (5th Cir. 2003), the same court, interpreting Texas law, held that a provision which said only that the "agreement" would be "governed by, and construed in accordance with" New York law was too narrow to cover tort claim. *Id.* at 726. And in *Mobil Exploration & Producing U.S., Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So.2d 11 (La.App. 2002), a Louisiana appellate court held that fraudulent conduct claims were encompassed by a choice of law clause governing "the work to be performed." *Id*. at 42-43. *But see Hall v. Sprint Spectrum L.P.*, 876 N.E.2d 1036 (Ill.App. 2007) (finding consumer protection claims governed by choice of law clause because argument that a termination fee was an unlawful penalty was fundamentally a creature of contract law).

In this case, the choice of law provision in the parties' contracts reads: "This agreement

---

[11]  The conclusion that these claims sound in tort is not taken lightly, and may ultimately prove dispositive. As discussed below, if the claim sounded in contract and/or were covered by the choice of law clause, the ultimate outcome of the predominance question would likely turn instead on whether another state's "fundamental public policy" can foreclose class treatment.

shall be governed by and interpreted in accordance with the laws of the State of Colorado."

(Rec. Doc 546-6 at 4).  When read in comparison to the above quoted cases, it is apparent that

this choice of law clause is narrow.  Unlike the *Mobil Exploration* clause language, which

covered all "work" and therefore included "fraudulent conduct," 837 So.2d at 42-43, this clause

only covers the "agreement."  As in *Benchmark Electronics*, the Court cannot read it to

encompass class members' consumer protection claims, which sound in tort.  *See* 343 F.3d at

726.

 The Court must therefore proceed with its analysis under the Choice of Law rules of

delictual or quasi-delictual obligations.  Louisiana Civil Code article 3542  provides:

> Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

 The Louisiana legislature provides even more specific choice of law rules in Articles

3543 and 3544, governing standards of conduct and issues pertaining to loss distributing rules,

respectively.  Consumer protection is inherently the former.  Article 3543 reads, in relevant part:

> Issues pertaining to standards of conduct and safety are governed by the law of the state in which the conduct that caused the injury occurred, if the injury occurred in that state or in another state whose law did not provide for a higher standard of conduct.
> In all other cases, those issues are governed by the law of the state in which the injury occurred, provided that the person whose conduct caused the injury should have foreseen its occurrence in that state.

 Comment b to that article advises that "[a]lthough derived from the general principles of

Article 3542, the rules contained in this Article prevail over Article 3542 because they are more specific." Further, comment i reads: "Injury sustained in more than one state. Cases involving multiple victims who sustained their respective injuries in different states should be handled independently for each victim."

Applying the Article 3542 factors, the Court finds as follows. General Steel is domiciled and has its principal place of business in Colorado. At least some of the conduct at issue occurred in Colorado as well: General Steel's project managers, sales force, and employees resided and worked in Colorado and communicated with the putative class members from General Steel's Colorado headquarters. (Rec. Doc. 569-3 at 45). Few if any of the allegations involve in-person contact with General Steel employees--almost all of the alleged misrepresentations were communicated telephonically. Further, the alleged promises to oversee the project presumably were to have been done from Colorado. That said, none of the putative class members are located in Colorado, and neither are any of the work sites where Howell failed to erect General Steel's buildings.

The Article 3543 analysis, which trumps, is more conclusive. Here, the injuries at issue occurred in each putative class member's home state. Thus, that state's law applies to that class member's claim unless Colorado's law provides for a "higher standard of conduct." La. C.C. art. 3543. Without investigating the relative strength of each state's consumer protection laws, it is sufficient that the Court observes that many of the states involved have conduct standards equal to or higher than Colorado's, as well as different standards of proof.[12] As to those class

_____

[12] Kreger asserts violations of two provisions of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. Ann. § 6-1-105. Section (1)(g) of the Act creates a cause of action when a person "[r]epresents that goods, food, services, or property are of a particular standard,

quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another" and section (1)(i) for one who "[a]dvertises goods, services, or property with intent not to sell them as advertised."  (Rec. Doc. 546-2 at 29) (Plaintiff does not specify in his Revised Second Amended Complaint the CCPA sections that apply to his claim; the Court's analysis here is limited to those sections cited in the relevant briefing).  Additionally, Kreger cites section (1)(u), which covers anyone who "[f]ails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  (Rec. Doc. 546-2 at 30).  *See also Rhino Linings USA, Inc., v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo. 2003) (distinguishing misrepresentation under the CCPA from contractual breach based on intent).

The Maryland consumer protection law, Md. Commercial Law, Code § 13-301, lists comparable violations: "Unfair or deceptive trade practices include any: . . . (2) Representation that: . . . (iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not" (notably lacking a knowledge requirement); "(5) Advertisement or offer of consumer goods, consumer realty, or consumer services: (ii) With intent not to supply reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition."

By contrast, California's consumer protection act is a strict liability statute, *Educational Testing Service v. Simon*, 95 F.Supp.2d 1081, 1090 (C.D.Cal. 1999), and in both North Carolina and Texas good faith is not a defense.  *Forbes v. Par Ten Group, Inc.*, 394 S.E.2d 643, 651 (N.C. Ct. App. 1990) ("That defendants may have made these misrepresentations negligently and in good faith, in ignorance of their falsity, and without intent to mislead, affords no defense to an action under N.C.G.S. § 75-1.1."); *Henry S. Miller Co. v. Bynum*, 797 S.W.2d 51, 55 (Tex.App. 1990) (for purposes of Texas CPA, "when a seller makes representations to a buyer, it under a duty to know if the representations are true").

Further, the Colorado courts have interpreted in the CCPA a robust "public impact" requirement.  In *Rhino Linings USA, Inc.*, 62 P.3d at 150, the court found that what was essentially a "private breach of contract action" involving three dealers was insufficient to prove a public interest in the matter.  This requirement, which is not evident in the consumer protection acts of most of the other states at issue here, arguably limits the standard of conduct prescribed, and certainly changes the standards of proof.

Finally, as discussed in more detail below, Colorado prohibits the recovery of treble damages in class actions under the CCPA, Colo. Rev. Stat. § 6-1-113(2)(a), and limits the availability of punitive damages. *Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 822 (Colo. 1992).  A number of states allow such recovery, which of itself might evidence an intent to create a higher standard of conduct.  *See also* La C.C. art. 3546 (addressing the award of punitive damages by Louisiana courts in choice of law context).

*See generally* Alan S. Brown & Larry E. Hepler, *Comparison of Consumer Fraud Statutes Across the Fifty States*, 55 Fed'n Def. & Corp. Couns. Q. 3, 274-77 (2005), Rec. Doc. 680-1 at 17.  *See also* Rec. Doc. 564-7 at 34, defendant's summary table of scienter requirements across the relevant states.  Taking the above into account, Plaintiff has failed to show that

members, the Court is bound by the Louisiana choice of law rules to apply their home state's laws, and cannot conclude that common issues predominate. *See Castano*, 84 F.3d at 741.

In holding that certification is not available due to differences in the laws of class members' home states, the Court follows a well documented recent trend in denying the availability of consumer protection class actions. *See In re Vioxx Products Liability Litigation*, 239 F.R.D. 450, 456 (E.D.La. 2006) ("the Court finds that each plaintiff's home jurisdiction has a stronger interest in deterring foreign corporations from personally injuring its citizens and ensuring that its citizens are compensated than New Jersey does in deterring its corporate citizens' wrongdoing"); Michael Isaac Miller, *The Class Action (Un)Fairness Act of 2005: Could it Spell the End of the Multi-State Consumer Class Action?*, 36 Pepp. L. Rev. 879, 902-906 (2009) (documenting difficulties in certifying consumer class actions in federal court due to variation in state consumer protection laws); Genevieve G. York-Erwin, *The Choice of Law Problem(s) in the Class Action Context*, 84 N.Y.U. L. Rev. 1793, 1805 (2009) ("A nationwide class suing in tort will almost certainly require application of multiple states' laws"); Edward F. Sherman, *Class Actions After the Class Action Fairness Act of 2005*, 80 Tul. L. Rev. 1593, 1610-11 (2006) ("There is general agreement that a multistate or national class action cannot satisfy the predominance requirement if the substantive laws of fifty (or a large number of states) must apply, and there are significant differences in the states' laws").

Public Policy Concerns

Even if the Louisiana choice of law rules for delictual and quasi delictual obligation pointed to Colorado law, the Court would still be required to determine if applying Colorado law

Colorado law provides a higher standard of conduct as to each putative class member.

would seriously impair the fundamental public policy of any of the class member's home states. La. C.C. art. 3515.[13] The availability of punitive damages and treble damages in some class members' home states, and their likely unavailability in Colorado, puts this question in serious doubt.

The CCPA prohibits the recovery of treble damages in class actions, Colo. Rev. Stat. § 6-1-113(2), and the Colorado courts are restrictive in their allowance of punitive damages under the CCPA. *Lexton-Ancira*, 826 P.2d at 822.

Several of the states that allow treble or punitive damages have expressed strong public policies favoring their availability that demonstrates those states' predominant interest in the dispute. *Walter v. Hughes Communications, Inc.*, 682 F.Supp.2d 1031 (N.D. Cal. 2010) ("Because the [Maryland Consumer Protection Act] would limit Plaintiffs to compensatory damages, this Court finds that the choice-of-law provision in the Subscriber Agreement conflicts with a fundamental policy set down in California law"); *see Maher and Associates, Inc. v. Quality Cabinets*, 640 N.E.2d 1000, 1009 (Ill. App. 1994) (provision of treble damages evidences strong Illinois public policy sufficient to trump choice of law clause); *Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667, 673 (D.Ga. 1983) (quoting *Zeeman v. Black*, 273 S.E.2d 910, 914 (Ga. App. 1980)) (Georgia Fair Business Practices Act's provision for treble damages for intentional violations demonstrated legislature's intent to provide aid in protecting public). In light of these differences, the Court might be required to apply those states' laws, regardless of

---

[13] Similarly, if the Court had found that the class members' claims sounded in contract, or that the choice of law clause controlled, it would have to determine if Colorado law "contravenes the public policy of the state whose law would otherwise be applicable." La. C.C. art. 3540.

the outcome of the initial choice of law analysis.

Kreger's response to this concern is that if this class is not certified, many if not all of the class members will be financially unable to pursue their claims in individual litigation. He offers as proof the deposition testimony of approximately ten of the putative class members in which they assert that they cannot afford individual litigation in this matter. (Rec. Doc. 546-2 at 8). While he concedes those class members' home states might have an interest in allowing punitive or treble damages, he argues that such an interest cannot be so strong as to cause those states to have an interest in denying any recovery at all. In *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal.App.3d 605 (Cal. App. 1987), a California appellate court chided a trial court that had found that it was not under an obligation to apply California law to a class action and "be the savior of the other 49 states of the union." *Id.* at 611. Instead, the appellate court found that California's strong pro-consumer laws could be properly applied to out of state class members "when their home states have no identifiable interest in denying such persons full recovery." *Id.* at 616. Following the same logic, the court in *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224 (Cal. App. 2001), noting that California provided "among the strongest" consumer protection laws in the country, held that the party challenging certification had failed to demonstrate that other states' consumer protection statutes required the use of the class members' home states' laws. *Id.* at 243-44.[14]

Kreger's argument on this point has two fatal flaws. First, the Court will not accept as a

---

[14] The *Wershba* court based its reasoning in part on the fact that there was no written choice of law clause. 91 Cal.Ap..4th at 244. However, the choice of law clauses it was concerned about were those that specified law particular to each class member, not choice of law clauses that specified a single state, as is the case in the instant litigation.

premise for overturning a forum state's strong public policy the speculation that the class members will be unable to pursue litigation individually. A discussed above, the class members' claims range from the tens of thousands of dollars to over one million dollars. Second, the consumer protection laws of California, the chosen law in the cases cited by Kreger, were as strong or stronger than the laws of the states whose citizens were being "deprived" of their home states' laws; those cases did not discuss the effect of depriving class members of remedies that were greater in their home states. *Clothesrigger*, 191 Cal.App.3d at 616; *Wershba*, 91 Cal.App.4th at 243. As such, those cases are not precedent for Kreger's proposition.

Kreger also argues that the putative class members have "small dollar claims" which are favored in the class action context. (Rec. Doc. 681-2 at 4-5). It is accurate that courts favor so-called small dollar claims, but this argument has rarely been referenced in cases where individual damages could be in the tens of thousands. Rather, these cases cited by Kreger stand for the proposition that large classes combine resources to leverage very small claims and change a company's course of conduct. *Feeney v. Dell, Inc.*, 908 N.E.2d 753, (Mass. 2009) (taxes at issue for lead plaintiffs totaled $13.65 and $215.55); *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1217 (N.M. 2008) ("scant" amount of damages alleged was ten to twenty dollars per computer); *McKee v. AT&T Corp.*, 191 P.3d 845, 848 (Wash. 2008) (less than twenty dollars per year per class member). Here, however, the putative class members' claims range from $32,000 to $1,180,000, (Joint Bench Book Tabs 208-209), which is not the sort of "small dollar" amount those courts had in mind. That argument is unpersuasive.

Because the Court has found that Colorado does not apply, it need not engage in an extensive analysis on this question. The above discussion is sufficient to address the additional

barriers to finding Colorado's as the appropriate choice of the law for this litigation.

*Predominance Analysis under Colorado Law*

Although the Court holds that Colorado law cannot apply to the class members' consumer protection claims, in the interest of completing the Rule 23(b) analysis, the Court will assume otherwise for the purpose of this section. The parties agree that Colorado law controls the class members' breach of contract claims.

In order to certify a class action in this matter, the Court would need a vision of "how a trial on the alleged causes of action would be tried." *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 425 (5th Cir. 2004) (quoting *Castano*, 84 F.3d at 752). There are two separate claims, each with different standards of proof under Colorado law. The Court will discuss them in turn to determine whether common issues predominate the case as a whole.

<u>Consumer Protection Claims</u>

Kreger asserts violations of two provisions of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. Ann. § 6-1-105.[15] Section (1)(g) of the act creates a cause of action when a person "[r]epresents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another" and section (1)(i) for one who "[a]dvertises goods, services, or property with intent not to sell them as advertised." (Rec. Doc. 546-2 at 29). Additionally, he cites section (1)(u), which covers anyone who "[f]ails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or

_____

[15] Plaintiff does not specify in his Revised Second Amended Complaint which CCPA sections apply to his claim; the Court's analysis here is limited to those sections cited in the relevant briefing.

sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." (Rec. Doc. 546-2 at 30).

Kreger urges the Court to focus on General Steel's acts and internal policies: "the focus of the cause of action is on Defendant's failure to disclose information concerning the services Defendants were to provide to customers, including not only erection services by Howell which General Steel knew to be lacking by March 2006 but also oversight services from 2005 forward, when General Steel knew its Project Managers were not adequately supervising projects." (Rec. Doc. 546-2 at 30).

The crux of this discussion is whether proof of the CCPA claims can be based on common facts and law, or whether the individuality of the referrals to Howell or claims of manager oversight prevent certification.

There are five elements to proof of a civil CCPA claim:

1) that the defendant engaged in an unfair or deceptive trade practice;

2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation;

3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

4) that the plaintiff suffered injury in fact to a legally protected interest; and

5) that the challenged practice caused the plaintiff's injury.

*Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

Of those, the first three could be subject to common proof in this case. The three

"deceptive trade practices" alleged all lend themselves to common proof.[16]  Kreger demonstrates,

via deposition testimony of General Steel staff as well as many members of the putative class,

that class members were given similar explanations of the services that General Steel would

provide.  Likewise, the referrals to Howell were comparable across the class.[17]  Furthermore, at

least part of Kreger's argument is that General Steel engaged in a deceptive trade practice as

soon as it referred Howell without undertaking a comprehensive check of his background.  By

definition, General Steel referred Howell to all of the putative class members, making this

analysis appropriate for class wide proof.  Kreger asserts that General Steel "failed to disclose

information on its own oversight services"; "failed to disclose that it had failed to adequately

investigate [Howell] before referring him"; and "failed to warm customers of mounting evidence

of serious criminal activity."  (Rec. Doc. 674-2 at 10).  To the extent Kreger intends to prove

---

[16]  Proof of a violation of Section 1(g) on the Act will turn on whether General Steel knew or should have known that their products were not of the quality represented; Section 1(i) on whether General Steel intended to sell goods not as advertised; and Section 1(u) on whether any failure to disclose was due to General Steel's intent to induce consumers into a transaction.

[17] Deposition testimony of the putative class members demonstrates that General Steel recommended Howell as highly capable and often as the only erector option: "Chris told us that [Howell] would do a – do us a very good job" (Rec. Doc. 546-4 at 5); "Worldwide was the only contractor recommended" (Rec. Doc. 546-4 at 19); "the same letter talks about Worldwide being their premiere contractor" (Rec. Doc. 546-4 at 25); "He said I'm Gregg Howell from Worldwide Concrete.  General Steel sent me here to look over your site because I'm going to be the person to lay your slab."  (Rec. Doc. 546-4 at 31); "Just Worldwide she told me" (Rec. Doc. 546-4 at 41); "[Howell] was the only person that Chris said that they, you know, did business with" (Rec. Doc. 546-4 at 49); "He was their number one, their number one builder.  He built a bunch of them.  He's the only one I ever heard.  There was no option of any other.  He was the guy, he'd do me a heck of a job, and all was good." (Rec. Doc 546-5 at 3); "they told me that he was dependable and that he was reasonable in his pricing" (Rec. Doc. 546-5 at 11); "he said, 'Our number one contractor is right there in your town'" (Rec. Doc. 546-5 at 27); "this was their number one man, I should not fear, he would get it done.  He was the best they had." (Rec. Doc. 546-5 at 30); "They recommended them.  We had no reason to search otherwise."  (Rec. Doc. 546-6 at 10).

these allegations with evidence about General Steel's policies or practices, it is possible that there are predominant fact questions that would make a class action expedient. The first element is therefore appropriate for class treatment.

The second element of a CCPA claims – that the challenged practice occurred in the course of defendant's business, vocation, or occupation – appears to be uncontroverted, and is similarly susceptible to common proof. The third element, public impact, raises problematic issues for the choice of law decision, but is nonetheless provable across the class.

The remaining two elements, however, do not lend themselves to common proof. An individualized determination would be necessary in each case to ascertain the extent of that class member's injury and whether it was causally related to a CCPA violation. On this point, the parties dispute whether "reliance" is an essential element to proof of injury under the CCPA. Kreger cites *Crowe v. Tull*, 126 P.3d 196 (Colo. 2006), for the proposition that reliance on the alleged practices is not an essential element of a private CCPA claim. (Rec. Doc. 605-3 at 14). Relying on *Crowe*, Kreger argues that proof of *contracting* with WWC is a sufficient injury to meet the requirements of the CCPA. But the cited portion of the *Crowe* opinion was referencing section 6-1-112 of the CCPA. That section deals with actions by the attorney general or district attorney seeking civil penalties, and the section does not require an actual injury or loss before a civil penalty can be awarded. The provision is intended to provide a deterrent, rather than compensatory, remedy. *May Department Stores Company v. State ex rel Woodard*, 863 P.2d 967, 972-73 (Colo. 1993). Section 6-1-113, which allows private actions, explicitly requires proof of an injury in fact. In *Crowe*, the Colorado court drew parallels between the requirements of section 6-1-112 and section 6-1-113 to conclude that the plaintiff's theory of injury and

causation was not too attenuated as a matter of law, and should be decided by a trier of fact. 126 P.3d at 210-11. It did not, though, obviate the need for proof of injury for claimants bringing private CCPA actions. Thus, Kreger's assertion that causation under the CCPA means only a purchase of services (Rec. Doc. 605-3 at 13) is inaccurate.[18]

The fact that individual proof of injury in fact and causation will be necessary is not dispositive. The Court's obligation is to determine whether common issues of fact and law *predominate*. *See In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D.Pa. 2001) ("Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class") (quoting *Lumco Indus., Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 173 (E.D.Pa. 1997). If proof of the first three requirements for bringing a claim under Section 6-1-113 will be the focus of a court's legal or factual analysis in each case, then a class action might still be the most expedient legal vehicle for the claims. The Fifth Circuit has approved class actions "where

---

[18] Kreger's reliance on *In re Mercedes-Benz* is also misplaced. The plaintiff class in that case brought claims alleging that Mercedes had failed to disclose the impending obsolescence of an analog network on which their vehicles' emergency response systems depended. 27 F.R.D. at 48. The District of New Jersey court held that the New Jersey Consumer Fraud Act did not require proof of reliance; instead, only a less rigorous "causal nexus" is necessary to prove "ascertainable loss." The court therefore concluded that "Plaintiffs will not need to prove at trial that each individual class member relied on Mercedes statements relating to [the emergency response system] when purchasing their vehicles. To the contrary, Plaintiffs can establish the necessary "causal nexus" between their ascertainable loss and the alleged misrepresentations simply by proving that with respect to the class as a whole that, had Mercedes disclosed . . . the fact that analog service would no longer be available after 2007, that disclosure would have effectively warned potential purchasers of vehicles equipped with analog only . . . systems that those systems would soon be rendered obsolete." *Id.* at 74. That case is distinguishable primarily because the New Jersey Consumer Fraud Act and the CCPA require different levels of proof. Unlike the New Jersey Act, an analysis under the CCPA cannot be limited to the defendant's acts: proof of injury and causation are prerequisites to recovery. *Hall* 969 P.2d at 235.

liability and punitive damages would be resolved commonly and injury, causation, and actual damages would be resolved individually." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999). To determine whether such efficiencies exist in this case, the Court will first examine the availability of class treatment for the breach of contract claims.

<u>Breach of Contract Claims</u>

In support of certification of his breach of contract claims, Plaintiff argues that there is an implied "Project Manager Oversight" provision in each of the contracts between the putative class members and General Steel. (Rec. Doc. 569-3 at 20). This provision was implied, they argue, by General Steel's assignment of Project Managers to every class member. (Rec. Doc. 569-3 at 15). Kreger emphasizes that its claims are based not on "varying oral representations" but rather on "misrepresentations by omission" (Rec. Doc. 569-3 at 20) and a consistent practice of promising and providing project managers despite knowing that the project managers would not oversee Howell's actions. (Rec. Doc. 569-3 at 26-27). He therefore argues that the act of assigning a Project Manager to each class member's account is sufficient to establish an implied-in-fact contract. General Steel asserts that the extent of each class members' reliance on their referrals must be resolved on an individual basis. (Rec. Doc. 564 at 29). The Court agrees.

The case Kreger cites in support, *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187 (Colo. 2001), highlights the flaw in his argument. There, the Colorado Supreme Court held that "[a] contract implied in fact arises from the parties' conduct which evidences a mutual intention to enter into a contract." *Id.* at 1192 (quoting *Osband v. United Airlines, Inc.*, 981 P.2d 616, 621 (Colo.App. 1990). Mutual intent cannot be proven unilaterally. Each parties' intent is a necessary element. Proof by Kreger that General Steel assigned a Project Manager to every

case does not account for variations between customers, who may or may not have understood "manager" to mean supervisor. That proof can come in form of witness depositions or from the "ACT Notes" kept as call-logs, which contain records of the conversations between sales representatives at General Steel headquarters and putative class members. It cannot be made using class wide proof.[19]

Certainly defendant's acts are the lynchpin of Kreger's arguments, but the breach of contract claims can only be proven by examining the communications made between General Steel and each individual class member. If this case were to proceed to trial as a class, each class member's breach of contract claims would need to be tried individually to determine if an implied oral contract was formed; only then would any common proof regarding General Steel's misrepresentations or investigations come into play.

Once again, because the Court holds that the choice of law difficulties prevent certification, a holding on this question is unnecessary. Nonetheless, plaintiffs have not yet provided an adequate blueprint for trial that demonstrates that resolution of common questions of fact or law would predominate or provide a superior means of adjudication. *See Robinson*, 387 F.3d at 425.

---

[19] General Steel also raises numerous additional fact issues that it argues prevent certification on this claim. These include, *inter alia*, the adequacy of individual building plans provided by General Steel (Rec. Doc. 564 at 25); the circumstances surrounding individual class members' inability to complete their projects (Rec. Doc. 564 at 25); putative class members' degree of dissatisfaction with WWC, if any (Rec. Doc. 546 at 26); and that some class members "paid money to WWC and received essentially nothing in return," while others were at least partially satisfied with WWC's work (Rec. Doc. 564 at 26). The Court agrees that there is a risk that these differences would spawn "mini-trials," but ultimately these concerns are secondary to the Court's holding that the alleged implied contract provision cannot, as a legal matter, be proven on a class-wise basis.

### III.  CONCLUSION

The Court is sympathetic to the claims of Kreger and the putative class members, but the weight of factors against certification prevents the Court from permitting them to pursue their claims in a single action before this Court.  Although the class arguably meets the requirements of Federal Rule of Civil Procedure 23(a), it falls short on several elements of 23(b) because common issues do not predominate:

1) If Colorado law does not apply, and the Court holds that under Louisiana choice of law rules it does not, then individual proof issues make it impossible for the Court to find that common issues predominate.

2) Even if Colorado law were to apply under the choice of law rules, the fundamental public policies of some class members' home states that allow greater recovery might prevent application of Colorado law, and again prevent common issues from predominating.

3) Even if Colorado law were to apply to all claims, the breach of contract claims cannot be proven across the class, nor can the injury and causation elements of any private CCPA claims.

Accordingly,

IT IS ORDERED that General Steel's Motion for Leave to File (Rec. Doc. 691) is GRANTED.  Kreger's Motion to Certify class (Rec. Doc. 546) is DENIED.  Kreger's motion to amend witness and exhibit list and his motion to expedite are MOOT.  (Rec. Docs. 584, 595). The outstanding motions to strike and objections to exhibits are resolved as set forth above.

New Orleans, Louisiana, this 19th day of July, 2010

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**